UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER HOFFMAN, | ) | CASE NO. 5:14CV1367 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY HELMICK |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| ALAN J. LAZAROFF, Warden, | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Respondent | ) | |

On June 15, 2014, Petitioner, Christopher Hoffman ("Petitioner), *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF Dkt. #1.  He seeks relief for alleged constitutional violations that occurred during his Summit County, Ohio Court of Common Pleas convictions for murder, involuntary manslaughter, and two counts of endangering a child. ECF Dkt. #4-6 at 1-3.  On September 29, 2014, Respondent Alan J. Lazaroff, Warden of the Mansfield Correctional Institution, in Mansfield, Ohio ("Respondent") filed a return of writ.  ECF Dkt. #4.

On December 29, 2014, Petitioner filed his traverse to the return of writ, addressing Respondent's assertions against his grounds for relief and asserting that his fourth ground for relief had not yet been exhausted in the state courts but he included it in the instant federal habeas corpus petition to comply with the statute of limitations for federal habeas corpus review. ECF Dkt. #7 at 11.  Petitioner requested in a separate motion filed on the same date that the Court stay and abey his petition for a writ of federal habeas corpus because of the unexhausted ground for relief.  ECF Dkt. #6.  Petitioner alternatively requested that the Court sever this ground from relief from his federal habeas corpus petition and dismiss it without prejudice in order to preserve federal review of the exhausted grounds for relief.  *Id.*

On January 2, 2015, Respondent filed his response to Petitioner's motion for stay and abeyance.  ECF Dkt. #8.  On January 13, 2015, Petitioner filed a reply brief.  ECF Dkt. #9.

On August 3, 2015, the undersigned issued a Report and Recommendation on the motion for stay and abeyance, recommending that the Court deny Petitioner's motion for stay and

abeyance, but grant his alternative request to sever his fourth ground for relief and proceed with the other exhausted grounds for relief in his instant federal habeas corpus petition.  ECF Dkt. #10.  The Court adopted the undersigned's Report and Recommendation and dismissed Petitioner's fourth ground for relief from the instant federal habeas corpus petition without prejudice.  ECF Dkt. #s 12, 13.

For the following reasons, the undersigned recommends that the Court DISMISS Petitioner's federal habeas corpus petition with prejudice.  ECF Dkt. #1.

## I.  SYNOPSIS OF THE FACTS

The Ohio Ninth District Court of Appeals set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 119 S.Ct. 2403 (1999).  As set forth by the Ninth District Court of Appeals, the facts are:

> At around 3:00 a.m. on December 10, 2007, EMS responders and several members of the Cuyahoga Falls Police Department were dispatched to an apartment shared by Hoffman, his wife, and their infant son.  Hoffman and his wife sought help for their son, N.H., born October 2, 2007, because he had an obstructed airway.  By the time the EMS responders arrived, N.H. had no heartbeat and was not breathing.  Although both the EMS responders and the hospital staff at Akron Children's Hospital attempted to revive N.H., they were unsuccessful.  N.H. was pronounced dead shortly after he arrived at the hospital.
>
> Subsequently, an autopsy was performed and a balled-up piece of tissue paper was removed form the back of N.H.'s throat.  N.H. also had several facial injuries and injuries to his mouth.  Moreover, when the medical examiner x-rayed N.H., she discovered that he had a broken collar bone and multiple rib fractures.  Although some of the rib fractures were new, many of the rib fractures displayed signs of healing, meaning that N.H. had sustained them at some point before his death.
>
> *          *          *
>
> The State produced evidence that Hoffman gave several different versions of the events that occurred at the time of his son's death when pressed about the details.  Hoffman told Officer Hill that he used toilet paper to clean off N.H.'s tongue and, before he could react, N.H. swallowed all of it.  Hoffman told Michele Mizda, a clinical social worker who spoke with him at the hospital, that he had used a tissue to wipe N.H.'s chin, a piece of the tissue came off, and the tissue went into N.H.'s mouth as he was crying.  Hoffman told Schaefer, the forensic investigator, that he had used several pieces of wetted, balled-up toilet paper to wipe the inside of N.H.'s mouth and lost

hold of the paper. Hoffman told Detective Dirker that he had used several pieces of wet toilet paper to wipe spit up from N.H. and that N.H. had "sucked it in." Finally, Hoffman told Detective Tlumac that he used wet toilet paper to clean N.H.'s mouth, but that he only dabbed at N.H.'s gums and the toilet paper never went past N.H.'s gum line. Detective Tlumac testified that, at different points during his interview with Hoffman, Hoffman told him: (1) he did not know if he was wiping N.H. or if N.H. "gulped" the toilet paper, but it ended up in his mouth; (2) when he was dabbing N.H.'s gum line, he did not know if N .H. sucked in the toilet paper or swallowed it, but it ended up in his mouth; and (3) when he was dabbing N.H.'s mouth, N.H. bit or grabbed hold of the toilet paper and tore a chunk of it away.

As previously set forth, both Dr. Kohler and Dr. Steiner testified that it would not be possible for a two month old to swallow the type of solid object found in N.H.'s throat. Both doctors testified that a two month old would expel the object due to a tongue thrust reflex unless the object was pushed past the point of the child's reflex. Dr. Steiner went on to explain that even if a child was sticking its tongue out at the point in time that a tissue was placed on top of the tongue, the tissue would not go beyond the midpoint of the tongue (where the thrust reflex ends) when the child retracted its tongue. Dr. Steiner explained that in that scenario the tissue would be scraped off by the child's upper lip and gum due to the small size of the child's mouth. Only if someone had forced the child's tongue down against its thrust reflex, Dr. Steiner testified, could the tissue have gone beyond the midpoint of the tongue.

In response to the testimony of Dr. Kohler and Dr. Steiner, the defense presented the testimony of Dr. Cyril Wecht, an expert in forensic, anatomical, and clinical pathology. Dr. Wecht testified that he believed it was possible for a two month old to swallow a tissue that came into contact with its mouth. According to Dr. Wecht, a baby's desire to swallow an item "might be a matter of palatability" and depend on whether the item "tastes good." Dr. Wecht ultimately concluded that N.H.'s death was accidental, but admitted that it was possible the tissue on which he asphyxiated had been intentionally placed into the back of his throat. The reason that Dr. Wecht thought the death was accidental was that, having reviewed all the evidence, he felt it was much more likely that Hoffman accidentally dropped the wad of tissue into N.H.'s throat. He specified: "I can think of many easier ways to kill a baby and not be discovered than to put a wad of tissue paper in the back of the mouth." Dr. Wecht testified that he had never heard of the term "infant tongue thrust" and did not know what it meant. He agreed, however, that a tissue would have to go past a child's gum line in order for it to be in the child's mouth.

Heidi Hoffman, N.H.'s mother, testified that N.H. was a good baby overall, but was fussy and spit up a lot during his feedings. Due to problems with N.H. spitting up and fussing after his bottle, Heidi stated that the pediatrician had suggested holding him upright for an hour after eating. Heidi testified that it was very rare to be able to console N.H. when he became fussy and that it usually took an hour or more of him crying before he would finally exhaust himself and fall asleep. Before N.H.'s death, Heidi stated that she left for work at around 7:00 a.m. and returned at around 5:30 p.m. Meanwhile, Hoffman worked two jobs; one from 12:00 p.m. until 5:00 p.m. and one from 6:00 p.m. until 6:00 a.m. Because Hoffman's day job

was situated in his father's home, he took N.H. with him to work each day, and Heidi took N.H. from him before Hoffman started his night job. Heidi then cared for N.H. in the evenings. Heidi admitted that Hoffman sometimes expressed an interest in arranging child care and told her that "it was stressful" and that "he thought [she] could probably do more to help out."

Heidi testified that she never abused N.H. or had any knowledge that he had ever been injured. On the day of N.H.'s death, Heidi testified that she was sleeping when Hoffman came into her bedroom and told her that N.H. was choking on some tissue he had swallowed. Heidi stated that the bathroom in their apartment had big towels, small towels, and wash cloths in it, as well as disposable wipes. Heidi verified that there also was a receiving blanket right on the rocking chair in N.H.'s bedroom and that she had used that very blanket to wipe off her hands when she tried to feel inside N.H.'s mouth for any obstruction.

Hoffman informed Mizda, the social worker at the hospital, that he felt like he was doing everything after N.H.'s birth and that "a lot of the responsibility seemed to fall [on] him ." Mizda testified that Hoffman seemed upset or angry during that portion of their conversation and, when she asked him how he felt, he replied that he "had gotten more pissed at Heidi than at [N.H.]" about the parenting schedule. Hoffman also spoke about his schedule when Detective Dirker interviewed him at the police station a few days after N.H.'s death. When speaking with Detective Dirker, Hoffman stated that "it pissed him off that he would come home from work at seven in the morning * * * and [Heidi] would * ** bitch about having to take care of the baby."

As previously discussed, Dr. Kohler noted several other injuries during her examination of N.H. Specifically, N.H. had two bruises to his face, one of which was old and one of which was fresh, a torn frenulum, bruised gums, a broken collar bone, and rib fractures. Dr. Kohler testified that bruising injuries in a two month old child are significant because those children are unable to move around on their own so as to accidentally bump into things. She further testified that the specific bruises she observed on N.H .'s face, both of which had been caused by some type of round object, could not have been sustained by medical intervention. As to N.H.'s rib fractures, Dr. Kohler testified that N.H. had fresh fractures, healing fractures without re-injury, and healed fractures that had been re-broken. Dr. Kohler counted a total of fifteen healing fractures, fourteen of which "were recent on healing." She was unable to estimate exactly when the healing fractures had occurred, but stated that it was at least a week before N.H.'s death. Dr. Kohler verified that while it is common not to have any external bruising with such fractures, a great deal of force is required to break a child's flexible ribs. Dr. Kohler could not say whether N.H .'s fresh fractures had been caused by CPR, as she testified that it would depend upon the technique used.

Dr. Steiner also testified regarding N.H.'s rib fractures. He testified that the mechanism of injury for such fractures is compression and the forcing of the rib cage backwards. When such a fracture occurs, Dr. Steiner went on, the baby is held by the thorax and the chest is compressed so that the back of the baby's chest wall goes behind its spine. Dr. Steiner testified that he could not definitively say whether N.H.'s new rib fractures were caused by

CPR compressions because he did not know how CPR had been performed. Dr. Steiner did say, however, that CPR would not have caused rib fractures if the baby was lying down at the time.

Hoffman's own expert also agreed that N.H.'s healing rib fractures were non-accidental. In his expert report, Dr. Wecht wrote that N.H.'s healed rib fractures and collar bone fracture "support a contention of non-accidental, adult inflicted injuries." He further wrote that "[t]here had to be some adult caretaker who could have caused the chest fractures." Dr. Wecht discounted Hoffman as the possible perpetrator of the injuries in his report due to the fact that he "worked two jobs and likely had little contact with the baby." At trial, however, Dr. Wecht admitted that he was unaware Hoffman was N.H.'s primary caretaker from 7:00 a.m. to 5:00 p.m. Moreover, Heidi Hoffman testified that in the four week period between her return to work from maternity leave and N.H.'s death, she and Hoffman had only asked three different people to watch N.H. on occasions when Hoffman knew he had to make deliveries for his day job. Heidi specified that her aunt watched N.H. once, her cousin watched him twice, and her friend watched him twice. Accordingly, in that four week span of time N.H. was only in the care of someone other than Heidi and Hoffman five times for a limited amount of time.

All of the EMS responders who treated N.H. and testified at trial testified that N.H. had blood in his mouth that they had to suction when treating him. N.H. also had a small amount of blood on his face below the nose and on his wrist. Maggie Hobson, one of the EMS responders, testified that N.H. was lying face up on the floor when she arrived on scene. Heidi also testified that N.H. was lying on the floor in front of his crib when she came into his room after Hoffman woke her up. None of the individuals who spoke with Hoffman ever recalled Hoffman saying that he put N.H. back into his crib once he began choking. Hoffman specifically told Detective Tlumac during the interview at the police station that after N.H. swallowed the toilet paper he left N.H. lying on the floor of his bedroom to go wake up Heidi. Even so, Officer James Stanley testified that he observed blood inside of N.H.'s crib when he inspected it on the day of N.H.'s death. N.H.'s bedding then was sent to the Bureau of Criminal Identification and Investigation where testing later confirmed that the blood on the bedding was consistent with N.H.'s DNA profile.

ECF Dkt. #4-1 at 1-10.

## II.  PROCEDURAL HISTORY

### A.  State Trial Court

On December 16, 2008, the Summit County Court of Common Pleas indicted Petitioner on:  one count of aggravated murder in violation of Ohio Revised Code ("ORC") § 2903.01(C); complicity to commit aggravated murder in violation of ORC § 2903.01(C)/2923.03(A)(2); murder in violation of ORC § 2903.02(B); complicity to commit murder in violation of ORC § 2903.02(B)/2923.03(A)(2); involuntary manslaughter in violation of ORC § 2903.04(A);

complicity to commit involuntary manslaughter in violation of ORC § 2903.04(A)/ 2923.03(A)(2); endangering children in violation of ORC § 2919.22(B)(1); complicity to commit endangering children in violation of ORC § 2919.22(B)(1)/2923.03(A)(2); endangering children in violation of ORC § 2919.22(A); and complicity to commit endangering children in violation of ORC § 2919.22(A)/2923.03(A)(2).  ECF Dkt. #4-3.  A supplemental indictment was filed on March 3, 2009 adding a count of complicity to commit endangering of children in violation of ORC § 2919.22(A)(1)/2923.03(A)(2) and a count of complicity to commit endangering children in violation of ORC § 2919.22(B)(1)/2923.03(A)(2).  ECF Dkt. #4-4.

On June 17, 2009, the trial court accepted the prosecution's recommendation before trial to dismiss the count two and count four charges of complicity to commit murder, the count six charge of complicity to commit involuntary manslaughter, and the complicity to commit endangering children in counts eight, nine, ten, eleven and twelve.  ECF Dkt. #4-5.

The trial court's June 17, 2009 journal entry also indicated that a jury trial began on June 9, 2009 and returned a verdict on June 12, 2009 finding Petitioner not guilty of aggravated murder, but guilty of murder, involuntary manslaughter, and two counts of endangering children. ECF Dkt. #4-5.

On June 29, 2009, the trial court sentenced Petitioner to a definite mandatory term of fifteen years to life in prison for the murder count, and a definite term of 5 years of imprisonment for the endangering children count, with the murder sentence to run consecutively with the endangering children sentence.  ECF Dkt. #4-6.  The trial court declined to sentence Petitioner for the two remaining counts, finding that they were allied offenses.  *Id*. at 2. Petitioner was also sentenced to five years of post-release control.  *Id*.

**B.** **Direct Appeal**

On July 8, 2009, Petitioner, through new counsel, filed an appeal of his conviction to the Ninth District Court of Appeals.  ECF Dkt. #4-15. Apparently, on November 17, 2009, the Ninth District Court of Appeals vacated the trial court's judgment of conviction sua sponte because the trial court failed to properly advise Petitioner of the terms of post-release control and remanded the case to the trial court for a new sentencing hearing.  ECF Dkt. #4-17.

With a time-stamped date of July 22, 2011, the trial court issued a journal entry indicating that on November 17, 2010, Petitioner appeared for resentencing and the Court noted that on June 12, 2009, Petitioner was found guilty of murder, involuntary manslaughter and endangering children.  ECF Dkt. #4-18.  The court then resentenced Petitioner to a definite term of fifteen years to life, a mandatory term, for the murder conviction, and declined to impose sentences for the involuntary manslaughter and endangering children convictions because they were all allied offenses with the murder conviction.  *Id.*

Also time-stamped on July 22, 2011 is a nunc pro tunc journal entry indicating that the entry was to correct the June 9, 2009 entry by deleting the reference to the endangering children charge in count nine as being dismissed.  ECF Dkt. #4-19.

Also with a time-stamped date of July 22, 2011, the trial court issued a nunc pro tunc journal entry stating that on November 19, 2010, it ordered a nunc pro tunc entry to correct its November 17, 2010 journal entry so as to indicate that on June 12, 2009, the jury found Petitioner guilty of murder as presented in count three of the indictment, involuntary manslaughter as presented in count five of the indictment, endangering children as presented in count seven of the indictment, and endangering children as presented in count nine of the indictment.  ECF Dkt. #4-20.  The entry also indicated the resentencing of Petitioner to a mandatory term of fifteen years to life in prison for murder, and a declination of resentencing on all of the other convictions as allied offenses with the murder conviction.  *Id.*

On August 22, 2011, Petitioner, through new counsel, filed a notice of appeal of the trial court's resentencing.  ECF Dkt. #4-21.  In his appellate brief filed on August 1, 2012, Petitioner presented the following assignments of error:

> 1. The trial court erred when it denied Mr. Hoffman's motion for relief from prejudicial joinder of offenses, greatly prejudicing his defense and violating his right to a fair trial and due process of law.  May 28, 2009 Journal Entry; Fifth and Fourteenth Amendments to the United States Constitution; Section 16, Article I of the Ohio Constitution; Crim. R. 52(A).

> 2. The trial court violated Mr. Hoffman's rights to due process and a fair trial when, in the absence of sufficient evidence, the trial court convicted him of murder in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution (Vol. 7, Tr. 973-975; July 22, 2011 Journal Entry).

7

> 3. Mr. Hoffman's conviction was entered against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.  (Vol. 7, Tr. 973-975; July 22, 2011 Journal Entry).

ECF Dkt. #4-24.  The State filed a brief as well and Petitioner filed a reply brief. ECF Dkt. #s 4-25, 4-26. On March 20, 2013, the Ninth District Court of Appeals affirmed the trial court's judgment.  ECF Dkt. #4-27.

## C.    Supreme Court of Ohio

On May 6, 2013, Petitioner, through new counsel, filed a notice of appeal in the Ohio Supreme Court.  ECF Dkt. #4-29.  In his memorandum in support of jurisdiction, Petitioner asserted the following propositions of law:

> 1.  Where evidence of an unrelated alleged crime is admitted in a murder trial and the admission of that evidence severely prejudices the defendant, the trial court deprives a defendant of due process when it denies the defendant's motion to sever counts.  United States v. Lane, 474 U.S. 438 (1986); Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.

> 2.  A conviction absent proof beyond a reasonable doubt of every element of the offense charged deprives a defendant of his constitutional right to due process of law.  *Jackson v. Virginia*, 443 U.S. 307 (1979); Fifth and Fourteenth Amendments to the United States Constitution, and Section 10, Article I of the Ohio Constitution.

ECF Dkt. #4-30.  On June 26, 2013, the Ohio Supreme Court declined to accept jurisdiction of Petitioner's appeal.  ECF Dkt. #4-31.

## III.    28 U.S.C. § 2254 PETITION

Petitioner executed the instant pro se petition on June 15, 2014 and the Clerk filed the petition with the Court on June 23, 2014.  ECF Dkt. #1.  Petitioner presents the following grounds for relief:

> GROUND ONE: Where evidence of an unnrelated[sic] crime is admitted in a murder trial and the admission of that evidence severely prejudices the defendant, the trial court deprived the Petitioner of due process when it denied the defendant's motion to sever counts.  Depriving him of his rights gaurenteed[sic] by the US and Ohio Constitions[sic].

> Supporting facts: The trial court should have severed the child endangering charge contained in Count Nine, alleging that the Petitioner violated a duty of care, protection, or support at some unrelated prior occasion, from the charges in Counts One, Three, Five, and Seven, all of which relate to the events surrounding NH's death.  By allowing the State to try Petitioner on the aggravated murder,

felony murder, involuntary manslaughter, and Count 7 child endangering charges at the same time as the distinct crime alleged in the third-degree felony child endangering charge in count 9, the trial court abused its discretion, considerably prejudiced Petitioner's defense and denied him a constitutionally fair trial.  The child endangering charge in count 9 alleged that the Petitioner created "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support, " tending to prove that the rib injuries were of the same or similar character as the abuse alleged to have caused N.H.'s death, or that they were based on the same act or transaction or based on multiple acts or transactions connected together, nor was there any evidence that the rib fractures were a part of a criminal scheme or course of conduct.

GROUND TWO: The trial court violated the Petitioner's rights to due process and a fair trial when, in the absence of sufficient evidence, the trial court convicted him of murder in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution and Sections 10 and 16 , Article I of the Ohio Constitution.

Supporting Facts: The evidence was insufficient to sustain the Petitioner's conviction for murder.  Before the State may obtain a conviction for any offense, it must prove every element of that offense beyond a reasonable doubt.  A conviction based upon insufficient evidence must be overturned.  When a verdict regarding a charge is not supported by sufficient evidence, the reviewing court must vacate the verdict and dismiss the charge.  Child endangering becomes a second-degree felony upon proof beyond a reasonable doubt that the defendant recklessly abused a child under the age of thirteen and the abuse results in serious physical harm.  RC 2919.22(B)(1) and (E)(2)(d).  Abuse signifies an act of violence, and indeed, during its closing argument, the State told the jury that the Petitioner's actions toward N.H. on December 10, 2007 were "purposeful," "reckless," and "violent."  However, the demonstrable evidence reveals that the piece of tissue removed from N.H.'s throat during the autopsy was very small approximately 2.36 inches by .98 inches by .5 inches.  The evidence further confirms that there was a significant amount of vomit and drool still in his mouth.  The evidence shows that this was a tragic accident.  Accordingly, the jury's verdict regarding second degree felony child endangering was not supported by sufficient evidence.

GROUND THREE: The Petitioner's conviction was entered against the manifest weight of the evidence, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

Supporting Facts: The jury's verdict finding the Petitioner guilty of felony murder was against the manifest weight of the evidence. The State did not present any credible evidence that the Petitioner had any knowledge, or that he disregarded a known risk, that using a small piece of tissue to wipe out N.H.'s mouth would be abusive and result in serious physical harm to N.H.  Therefore, the jury's verdict on the second-degree child endangering charge was against the manifest weight of the evidence.  Further, since the jury's verdict on the murder charge was predicated on a guilty verdict on the Count 7 child endangering charge, that conviction must also be reversed.

GROUND FOUR: The Petitioner received ineffective assistance of counsel both at the trial court level and at the appellate level.  Appellate counsel failed to raise the ineffective assistance of counsel claim regarding trial counsel and failed to

9

file a post conviction petition as promised.  Appellate counsel admitted her
ineffective performance.

Supporting Facts: Appellate counsel should have raised the issue of ineffective
trial counsel.  Trial counsel focused more on developing a civil case than
defending his client.  He alienated the jury by talking down to them and
completely disregarded his client's insistance[sic] on testifying on his own behalf.
Appellate counsel was ineffective in the arguement[sic] she drafted for the
appeals.  By her own admission she stated that she should have prevailed but she
argued it wrong.  In addition she missed the post-conviction deadline after
promising to prepare and file the post-conviction petition.  Her performance
prompted a complaint to the disciplinary counsel.

ECF Dkt. #1.

On September 29, 2014, Respondent filed her answer/return of writ.  ECF Dkt. #4.  On
December 29, 2014, Petitioner filed a motion for stay and abeyance concerning his fourth ground
for relief.  ECF Dkt. #6.  He thereafter filed his traverse.  ECF Dkt. #7.  Respondent opposed the
motion for stay and abeyance and Petitioner filed a reply brief.  ECF Dkt. #s 8, 9.  As explained
above, the undersigned issued a Report and Recommendation to the Court recommending that
the Court deny Petitioner's motion to stay and abey but granting Petitioner's alternative request
to sever his fourth ground for relief so that he could proceed with his other grounds before this
Court.  ECF Dkt. #10.  The Court adopted the undersigned's Report and Recommendation on
September 28, 2015 and dismissed Petitioner's fourth ground for relief without prejudice.  ECF
Dkt. #s 12, 13.  Thus, the instant Report and Recommendation addresses Petitioner's three
remaining grounds for relief.

## IV.    **PROCEDURAL BARRIERS**

Respondent challenges Petitioner's first and fourth grounds for relief as procedurally
barred.  *See* ECF Dkt. #4 at 19-22.  This Court has already dismissed Petitioner's fourth ground
for relief without prejudice for Petitioner's failure to exhaust his state court remedies.  ECF Dkt.
#12, 13..  As to Petitioner's first ground for relief, Respondent asserts that it is procedurally
defaulted and otherwise without merit.  Accordingly, the undersigned will set forth only the law
on procedural default in this portion of the Report and Recommendation.

The procedural default doctrine serves to bar review of federal claims that a state court
has declined to address when a petitioner does not comply with a state procedural requirement.

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).   In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there are no independent and adequate state grounds for a state court decision absent a clear statement to the contrary. *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit established a four-pronged analysis to determine whether a claim has been procedurally defaulted under *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).  Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal claims. *Coleman,* 501 U.S. at 729-30; *Richey v. Mitchell*, 395 F.3d 660 at 678 (2005) (holding that "a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (holding that if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (holding that even if the issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises).  Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d at 313-14.  Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for

the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).

## V.    STANDARD OF REVIEW

The undersigned recommends that the Court find that the AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), cert. denied, 522 U.S. 1112 (1998). Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for a writ of habeas corpus. The AEDPA provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000).  Further, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Id.*; *see also Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

> A.  Decisions of lower federal courts may not be considered.
>
> B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.
>
> C.  The state court decision may be overturned only if:
>
> > 1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;
> >
> > 2.  the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or
> >
> > 3.  'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or
> >
> > 4.  the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.     Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.     Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), cert. denied, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), cert. denied, 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), cert. denied, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The United States Supreme Court has observed:

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99

S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786-787, 178 L.Ed.2d 624 (2011).

## VI.    LAW AND ANALYSIS

Based upon procedural barriers, the undersigned takes Petitioner's remaining grounds for relief out of order.

### A.    GROUND FOR RELIEF NUMBER 3- NONCOGNIZABLE

In his third ground for relief, Petitioner contends that his convictions are against the manifest weight of the evidence because the State failed to present any credible evidence that he knew or disregarded a known risk that using a small piece of tissue to wipe out his infant son's mouth would be abusive and cause serious physical harm.  ECF Dkt. #1 at 8.  Respondent asserts that this ground for relief is not cognizable in federal habeas corpus.  ECF Dkt. #4 at 34.

The undersigned recommends that the Court find that Petitioner's third ground for relief is not cognizable in federal habeas corpus review.  *Chisholm v. Turner*, No. 5:13CV976, 2014 WL 3349591, at *4-*5 (N.D. Ohio July 8, 2014).  Such a claim is not cognizable before this Court because "[a] 'manifest weight of evidence' claim which is based on a state law concept that 'is both quantitatively and qualitatively different' from a constitutional due process sufficiency of evidence standard, raises an issue of state law only." *Ladd v. Tibbals,* No. 5:11-cv-173, 2012 WL 5364242, at *7 (N.D. Ohio, Sept. 11, 2012), unpublished, Report and Recommendation adopted by 2012 WL 5364406 (N.D. Ohio, Oct. 30, 2012); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1998)).  Manifest weight claims are derived from purely state law whereby the state appellate court sits as a "thirteenth juror and disagrees with fact finder's resolution of conflicting testimony" and finds that the "jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Tibbs v. Florida*, 457 U.S. 31, 41-47 (1982); *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541, 546-548 (1997)(superseded by state constitutional amendment on

other grounds, *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), cert. denied 523 U.S. 1125 (1998)), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

Accordingly, the undersigned recommends that the Court decline to review Petitioner's third ground for relief because it lacks cognizability.

### B.    GROUND FOR RELIEF NUMBER 1 - PROCEDURAL DEFAULT

In his first ground for relief, Petitioner asserts that the trial court committed prejudicial error when it denied his motion to sever the unrelated crime of child endangering charged in Count 9 of the Indictment.  ECF Dkt. #1 at 5.  He contends that no evidence was produced tending to prove that the old rib fracture injuries charged in Count 9 were of the same or similar character or part of the same transaction as the abuse alleged to have caused the baby's death as charged in the other counts of the Indictment.  *Id*.  Respondent asserts that Petitioner has procedurally defaulted this ground for relief because he failed to renew his assertion concerning Count 9 at trial and the Ohio appellate court enforced the contemporaneous objection rule which bars consideration of the claim by this Court.  ECF Dkt. #4 at 26-27.

The undersigned recommends that the Court find that Petitioner has procedurally defaulted this ground for relief.  Ohio employs a contemporaneous-objection rule, under which "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." *Shafer v. Wilson*, No. 07–3284, 364 Fed. Appx. 940, 2010 WL 395914 at *5 (6th Cir. Feb.4, 2010) unpublished, quoting *State v.1981Dodge Ram Van*, 36 Ohio St.3d 168, 522 N.E.2d 524, 526 (Ohio 1988).

In overruling a federal habeas corpus petitioner's objection to a Report and Recommendation finding that procedural default barred the petitioner's ground for relief alleging that the trial court improperly denied his motion to sever, Judge Lioi held in *Howard v. Turner* that:

> A federal habeas court is generally bound by a state court's interpretation of state law. *Railey v. Webb*, 540 F.3d 393, 398 (6ᵗʰ Cir. 2008)(quotation marks and citation omitted); *Maldonado v. Wilson*, 416 F.3d 470, 476 (6ᵗʰ Cir. 2005)(quotation marks and citation omitted).  Ohio courts recognize the procedural rule that an objection to joinder must be renewed at trial.  *See State v.*

*Sapp*, 822 N.E.2d 1239, 1251-52 (Ohio 2004) (collecting cases recognizing the rule); *State v. Miller*, 664 N.E.2d at 1317 (citations omitted); *State v. Walker*, 585 N.E.2d 848, 851 (Ohio Ct. App. 1990) (collecting cases). The rule represents an adequate and independent ground for denying the claim.

In the instant case, the Ninth District Court of Appeals noted that Petitioner did not renew his motion to sever Count Nine either at the close of the State's case or at the end of presentation of all of the evidence.  ECF Dkt. #4-1 at 2.  The court cited to Ohio law indicating that in order to preserve an alleged error regarding joinder of offenses, a defendant must renew a motion to sever either at the close of the State's case or at the conclusion of all of the evidence. *Id.* (citations omitted).  The appellate court further held that a failure to renew a motion to sever results in a waiver of the issue on appeal.  *Id.*, citing *State v. Vu*, No. 11CA0042-M, 2012 WL 603995, at *12, 2012-Ohio-746 (Ohio App. 9th Dist. Feb. 27, 2012).  Accordingly, procedural default bars this Court's consideration of Petitioner's first ground for relief, absent Petitioner's showing of cause for failing to renew the motion to sever at trial and resulting prejudice, or a showing that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749.

Petitioner argues in his traverse that his counsel was ineffective in failing to renew the issue of joinder/severance at trial.  ECF Dkt. #7 at 16-17.  He also asserts that he is untrained in the law and thus relied upon his counsel's knowledge and advice.  *Id.* at 17.  He notes that he raised the ineffectiveness of trial counsel in his fourth ground for relief of the instant federal habeas corpus petition.  *Id.*  However, as explained *supra*, this Court dismissed Petitioner's fourth ground for relief without prejudice because Petitioner failed to exhaust this claim in the state courts and offered no good cause for failing to exhaust and the claims of ineffectiveness of counsel that Petitioner presented in that ground for relief were plainly meritless.  ECF Dkt. #12. *See Butler v. Sheldon*, 2014 WL 584747, at *6 (N.D. Ohio, Feb. 12, 2014)("Petitioner cannot show cause for his procedural default because he has not presented his claim for ineffective assistance of appellate counsel to the state courts.").  Moreover, Petitioner did not even include in his fourth ground for relief an allegation that trial counsel was ineffective for failing to renew the motion to sever at trial or on appeal.  ECF Dkt. #1 at 10-11.  Accordingly, Petitioner has not

established cause in order to excuse his procedural default.  The Court need not reach the issue of prejudice since Petitioner failed to show cause for not asserting the ineffectiveness of trial counsel as to this issue.  *See Barkley v. Konteh*, 240 F.Supp.2d 708, 714 (N.D. Ohio 2002).

Thus, in order to excuse his procedural default, Petitioner must show that the failure of this Court to consider his ground for relief will result in a fundamental miscarriage of justice.  To meet this standard, Petitioner must show new evidence of innocence that is so strong that a reviewing court cannot have confidence in the outcome of the trial.  *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Id*. at 324.

Petitioner has offered no such evidence.  Accordingly, the undersigned recommends that the Court find that Petitioner has procedurally defaulted his first ground for relief.

### C.    GROUND FOR RELIEF NUMBER 2 - SUFFICIENCY OF THE EVIDENCE

In this ground for relief, Petitioner asserts that the evidence was insufficient to convict him of felony murder.  ECF Dkt. #1 at 7.  Petitioner contends that the evidence showed only that the death of N.H. was a tragic accident and involved no "purposeful," "reckless," and "violent" actions to sustain the convictions of felony child endangering which was the predicate felony for the murder conviction.  *Id*.

An allegation that the verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reh'g denied, 444 U.S. 890 (1979), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  In order to establish an insufficiency of the evidence claim, the relevant inquiry is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000), quoting *Jackson*, 443 U.S. at 319.  When reviewing the sufficiency of the

evidence, a habeas court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for the jury. *See United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir.1995).  Moreover, the inquiry is not whether the trier of fact made the correct determination of guilt or innocence, but whether it made a rational decision to acquit or convict. *Williams v. Haviland,* No. 1:05CV1014, 2006 WL 456470, *3 (N.D.Ohio Feb. 24, 2006), citing *Herrera v. Collins*, 506 U.S. 506 U.S. 390, 401-02, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).

In determining whether the state court's determination was objectively unreasonable, the Court must first determine whether the evidence was sufficient to convict under *Jackson*.  *See Pinchon v. Myers*, 615 F.3d 631, 643 (6th Cir. 2010).  If sufficient evidence exists with which to convict, the inquiry ends. *Id*.  If the Court finds that the evidence is insufficient to convict, then it must apply the AEDPA deference standard and determine whether the Ohio appellate court's determination as to the trial court's verdict was "objectively unreasonable" in concluding to the contrary, keeping in mind that it is looked at "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.*, quoting *Tucker v. Palmer*, 615 F.3d 631, citing *Jackson*, 443 U.S. at 319.  This is the "double layer" of deference due a state court determination about the sufficiency of the evidence. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).   A District Court is not permitted to overturn a conviction merely because it would have acquitted had it acted as the finder of fact.  *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985), and *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983).

In the instant case, the Ohio appellate court cited to Ohio caselaw in determining Petitioner's sufficiency of the evidence argument.  ECF Dkt. #4-1 at 3-5.  However, the cases cited by the Ohio appellate court, *including State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, 1997-Ohio-52 (1997), and *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), both cite to *Jackson* and the standard of review for a sufficiency of the evidence analysis.

The Ohio appellate court noted that Petitioner was not challenging the Count 9 child endangering conviction stemming from the prior rib fractures in his insufficiency of the evidence assertion, but rather, he was challenging the Count 7 felony child endangering conviction stemming from conduct that occurred on the day of N.H.'s  death, which served as the predicate

for the felony murder conviction.  ECF Dkt. #4-1 at 4.  The court recited the requirements for

child endangering as set forth in ORC § 2919.22(B)(1), applied the *Jackson* standard, and cited

to the testimony at trial from which the jury could have concluded that the State proved beyond a

reasonable doubt that Petitioner placed a balled-up tissue in N.H.'s throat and N.H. was the

victim of abuse.  *Id*. at 5-6.  The felony murder statute under which Petitioner was convicted,

ORC § 2903.02(B), provides as follows:

> (B) No person shall cause the death of another as a proximate result of the
> offender's committing or attempting to commit an offense of violence that is a
> felony of the first or second degree and that is not a violation of section 2903.03
> or 2903.04 of the Revised Code.

ORC § 2903.02(B).  The second degree offense of violence upon which the felony murder

statute in this case was based is child endangering as defined in ORC § 2919.22(B)(1):

> (B) No person shall do any of the following to a child under eighteen years of age
> or a mentally or physically handicapped child under twenty-one years of age:
>
> (1) Abuse the child.

The statute goes on to state that the violation of ORC 2919.22(B)(1) is a second degree felony "if

the violation is a violation of division (B)(1) of this section and results in serious physical harm

to the child involved."  ORC § 2919.22(E)(2)(d).

        The Ohio appellate court reviewed evidence presented at trial which included Petitioner's

statements to police that he tried to clean out N.H.'s mouth with toilet paper while he was

feeding him and before he could react, N.H. swallowed the toilet paper and he was unable to

remove it from N.H.'s mouth.  ECF Dkt. #4-1 at 5.  The court cited to the testimony of forensic

investigator Amy Schaefer of the Summit County Medical Examiner's Office who indicated that

Petitioner told her that N.H. began to drool during his feeding, so he looked for something to

wipe N.H.'s mouth and went to the bathroom and wetted some pieces of toilet paper, balled them

up and was wiping the inside of N.H.'s mouth when he lost hold of the toilet paper and could not

retrieve it.  *Id*.  Petitioner also told Detective Dirker that he had used two or three sheets of wet

toilet paper to wipe N.H.'s mouth after he spit up during feeding when N.H. "sucked it in" and

Petitioner could not retrieve it.  *Id*.  He told Detective Tlumac that he used three or four pieces of

toilet paper to wipe N.H.'s mouth and the pieces ended up in N.H.'s mouth as he used it to dab N.H.'s gumline. *Id.*

The Ohio appellate court cited to the testimony of medical experts, including Dr. Kohler, and Dr. Steiner. Dr. Kohler, Summit County Chief Medical Examiner, who performed N.H.'s autopsy, testified that she removed a two-and-a quarter inch by one inch by one-half inch obstruction from the very back of N.H.'s throat. ECF Dkt. #4-1 at 5. She found the obstruction consistent with two thin layers of facial tissue and she testified that it was impossible for N.H. to have swallowed or sucked in the balled-up tissue because infants have a reflex that causes them to push solid materials out of the mouths with their tongues and thus an infant could swallow foreign materials only if someone pushed the material past the point of the infant's reflex. *Id.* The court indicated that Dr. Kohler testified that she ruled N.H.'s death a homicide because there was no way the balled-up tissue got in N.H.'s throat "without the assistance of another person." *Id.*

The Ohio appellate court further cited to Dr. Kohler's testimony that N.H. had other injuries, including fresh and healing bruises to his face in two locations, a torn frenulum, bruised gums, fifteen old rib fractures, new rib fractures, and a new fracture to N.H.'s collar bone. ECF Dkt. #4-1 at 5. Dr. Kohler testified that the old rib fractures showed signs of healing and she opined that those fractures occurred more than a week before N.H.'s death and required a great deal of force to break as infant ribs are very flexible. *Id.*

The appellate court also cited to the testimony of Dr. Steiner, the Medical Director of the Care Center at Akron Children's Hospital, who reviewed N.H.'s case based upon his experience with child abuse pediatrics. ECF Dkt. #4-1 at 5. He testified that Petitioner's explanation as to how the tissue paper came to be in N.H.'s mouth was not plausible because based upon the size of the balled-up tissue, the size of an infant's mouth, the tongue thrust reflex of a two month old baby, "it would not be plausible for that [two-month old] to have gotten that hunk of tissue down into the back of his throat without it having been placed there." *Id.* Dr. Steiner opined that the tissue would have had to have been placed beyond the midline of N.H.'s tongue in order for it to have gotten into the position in which it was found. *Id.*

Based upon the elements of child endangering as charged in Count 9 and the felony murder charge, and the evidence recited by the Ohio appellate court, the undersigned recommends that the Court find that the Ohio appellate court applied the proper legal standard in holding that sufficient evidence was presented from which a rational trier of fact could have concluded that Petitioner recklessly abused N.H. on the day of his death by at least recklessly placing balled-up tissue in N.H.'s throat which caused his death.  ECF Dkt. #4-1 at 6.  Based upon the same elements and testimony recited by the Ohio appellate court, the undersigned further recommends that the Court find that the Ohio appellate court's decision was not contrary to or an unreasonable application of United States Supreme Court precedent.

**VII**.    **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.

DATE:  May 13, 2016                                    _/s/ George J. Limbert_____
                                                       GEORGE J. LIMBERT
                                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).